## CIRCUIT COURT OF THE CITY OF RICHMOND

Virginia Real Estate Commission

v.

John F. Batte, Jr.,
Benjamin S. Booth, Jr.,
and J. F. Batte & Sons
of Richmond, Inc.

November 7, 1975

Case No. 7831

BY JUDGE ALEX H. SANDS, JR.

This is an appeal from the action of the Virginia Real Estate Commission revoking the real estate broker's license of J. F. Batte & Sons of Richmond, Inc., and of J. F. Batte, Jr., and the real estate license of Benjamin S. Booth, Jr. This action was based upon the findings of the Commission as a result of a duly constituted hearing, the basis of such action being that the defendants were found to have violated subsections (1), (2), (3), (8), (10), and (16) of POR 9–23 (formerly Virginia Code § 54–762(m)).[1]

---

[1] These subsections provide that the Virginia Real Estate Commission has the authority to suspend and revoke any license issued under the provisions of Chapter 18, Title 54, Code of Virginia, 1950, as amended, at any time that a licensee is being guilty of:

(1) Making any substantial misrepresentation;

(2) Making any false promise of a character likely to influence, persuade or induce;

(3) Pursuing a continued and flagrant course of misrepresentation, or making of false promises through agents or salesmen or advertising or otherwise;

(8) Being unworthy or incompetent to act as a real estate broker or salesman in such a manner as to safeguard the interest of the public;

(10) Any other conduct, whether of the same or a different character from that herein specified, which constitutes improper, fraudulent, or dishonest dealing;

These conclusions so reached by the Commission are based, essentially, upon the following findings of fact from the evidence taken at the hearing. Warren Latta, Jr., and Katherine B. Latta, husband and wife, and Mark H. Boyd, Jr., and Ruth J. Boyd, husband and wife, were at all times pertinent to the proceeding in question, owners of certain property located on Willis Road in Chesterfield County, Virginia. These parties will hereinafter be referred to as "Sellers." Sellers had, prior to the execution of the option agreement in question, given J. F. Batte & Sons of Richmond, Inc., hereinafter referred to as "Batte, Inc.," an exclusive listing of the properties for a stated period of time. One Jack Dempsey, agent acting for Sandman Motel group operating out of Atlanta, Georgia, presented a tentative contract of purchase which Sellers, after conferring with their attorney, found to be unacceptable.

The defendant Booth, handling the property for Batte, Inc., then proposed a unilateral option agreement under the terms of which the Sandman Motel was to place $5,000 in escrow with J. F. Batte, Jr., as escrow agent, such $5,000 to be applied on the purchase price if the sale went through and to be forfeited to the Sellers in the event that Sandman Motel did not go through with the sale.

This option agreement was executed by the Sellers, individually, and by Batte, Inc., on June 22, 1973, and was to remain outstanding until October 1, 1973. The instrument on its face acknowledged receipt of the sum of $5,000 to be held in escrow upon conditions set forth in the agreement. The $5,000 was never paid by Sandman Motel, and on June 25, 1973, Sandman Motel rejected the option agreement and so notified the defendant Booth. Booth communicated this information concerning the rejection of the agreement to Bolling Batte, the attorney who had prepared the instrument for the Sellers and who Booth considered to be Sellers' attorney insofar as the option transaction was concerned.

Upon being advised by Booth of the rejection of the option agreement, John F. Batte, Jr., instructed Booth that the Sellers must be immediately notified of such rejection, and Booth responded that he had already taken care of the matter by notifying "their attorney." It is abundantly clear from a review of the record, including the transcript

---

(16) Violating or cooperating with others in violating any provision of this chapter or any lawful rule or regulation promulgated by the Commission.

of the hearing before the Commission, that Booth did in fact consider Bolling Batte as attorney for Sellers and felt that he had discharged his duty by informing Batte of the rejection of the option. It is equally as clear from the record that Bolling Batte acted throughout under the impression that he was only employed for the sole purpose of drafting the option agreement and did not consider himself as attorney for the Sellers in the general handling of the transaction, although his views as to his limited participation in the transaction do not appear to have been transmitted to Booth.

It is conceded that Sellers did not acquire actual information of the rejection of the offer until about October 1, 1973, at which time they contacted Booth who informed them that the option had not been exercised.

*Action of Commission as Affecting John F. Batte, Jr., and J. F. Batte & Sons of Richmond, Inc.*

There was not one scintilla of evidence before the Commission that either John F. Batte, Jr., in his individual capacity, nor acting for J. F. Batte & Sons of Richmond, Inc., was derelict in his handling of the transaction in question. When notified by Booth, promptly after the rejection of the option, that the option had fallen through, he immediately directed Booth to notify Sellers of the situation. Having been informed by Booth that this action had already been taken by advices to this effect given by Booth to "the attorney for the Sellers," there was no further duty upon Batte or the corporation to investigate to see whether or not this information had been communicated by Sellers' attorney to them. The fact that Bolling Batte may have considered that the duty to notify the Sellers did not fall within the purview of his particular area of representation of the Sellers can certainly not be imputed to John F. Batte, Jr., or to the corporation. The only other basis upon which the action of the Commission in revoking the licenses of John F. Batte, Jr., and the corporation could be sustained would be that they were chargeable with the derelictions, if any, of Booth. The rules and regulations promulgated by the Commonwealth of Virginia for Occupational Regulation provides (POR.9–30) as follows:

> Any unlawful act or violation of any of the provisions of this chapter by any real estate salesman, employee, or partner or associate of a licensed real estate broker, shall not be cause

for the revocation of a license of any real estate broker, partial or otherwise, unless it appears to the satisfaction of the Commission that such licensed real estate broker, partner or associate had guilty knowledge thereof.

As stated, there is absolutely no evidence of any such guilty knowledge upon the part of John F. Batte, Jr., or the corporation.

### Evidence as to Booth

As pointed out above, Booth, from all of the evidence, appeared to have informed Bolling Batte of the rejection of the option shortly after Booth had received this information himself. It is further perfectly apparent that this action was taken by him in the belief that Bolling Batte was acting as attorney for Sellers in this transaction. This belief upon his part was justified by the fact that Bolling Batte was the attorney who drew the option agreement for Sellers at their request.

The only basis upon which the Commission's action against Booth could be sustained would be if there was sufficient evidence to support a finding that Booth had made a material misrepresentation to Sellers that the $5,000 has actually been received. If there is any credible evidence to support this position, then the Commission was justified in its action as to Booth because of such misrepresentation. A review of the evidence is required on this point. The gravamen of the complaint against Booth is twofold. First, it is claimed that he violated the duty owed his clients, the Boyds and the Lattas, in not having promptly advised them that their option had been rejected; and, secondly, that prior to their execution of the option agreement, Booth told them that he had the $5,000 option money in hand.

The first charge has already been discussed. The undisputed evidence is that Booth promptly reported the rejection of the option to Bolling Batte who he believed to be the attorney for the Boyds and Lattas handling all legal matters in connection with the option. Batte, on the other hand, felt that his sole duty to the property owners was to draft the option agreement and that his representation of their interests ceased at this point. This failure of communication between Booth and Bolling Batte can, beyond doubt, be characterized as carelessness upon the part of both, but as a basis for a charge of bad faith on the part of either, it falls miserably short of the mark.

The second charge is that Booth made a deliberate misrepresentation to the Sellers to the effect that the $5,000 option money was in hand

prior to their signing the option agreement. The evidence as to *when* this alleged statement is supposed to have been made is in a complete state of confusion. Latta, on direct examination, states emphatically that the statement was made *prior* to the signing of the option. Yet, on cross examination, he admits that he cannot say whether it was before or after. More important, when asked just exactly *what* Booth said,[2] Latta gives this revealing answer:

> We discussed the five thousand dollars that night. Mr. Booth mentioned well, there was a lot of things in it and *it has been quite a while ago and it was confusing, about this option money*. (Emphasis added.)

Boyd, when discussing the events of the night in which the statement is alleged to have been made, in a sworn affidavit, said that Booth stated that he, Booth, was *not* to receive any of the $5,000. Yet in testimony before the Commission, he flatly states that Booth said that he *was* to receive part of the $5,000. When challenged on these conflicting statements by defense counsel, Boyd's only explanation is: "One forgets."

This colloquy between one of the hearing officers and Boyd is quite significant:

> The Hearing Officer: Let's concentrate now on the statement and the affidavit, the sworn statement? The one that you alleged that Mr. Booth told you that he had the five thousand dollars. You said in your affidavit that Mr. Booth told you that he would *not* be entitled to any part of the five thousand dollars. Do you recall making that statement.
>
> Witness Boyd: (No response).

> \*　　\*　　\*　　\*

> The Hearing Officer: This morning you testified that Mr. Booth told you that his commission *would* come out of the five thousand dollars? Is that correct?
>
> Witness Boyd: That is what he told us before we ever signed this, before we ever signed that.

> \*　　\*　　\*　　\*

---

[2] And this, of course, is the underlying basis of the charge against Booth.

> The Hearing Officer: What explanation do you give for the different testimony today?
>
> Witness Boyd: Because I don't recall what I have signed there.

Tr. 41, 42.

Is it upon this type of evidence that a man's livelihood is to be taken from him?

Aside, however, from the negative nature of the evidence against Booth, these undisputed facts are quite relevant.

(1) The option agreement was never accepted by the potential purchaser and, therefore, never came into being.

(2) There was never any payment to anyone of $5,000 or of any amount by the potential purchaser under the option agreement.

(3) Neither Booth nor either of the other named defendants received a nickel from anyone in connection with the option agreement.

(4) There is no conceivable motive which would have prompted Booth to make the statement with which he is charged.

But beyond and above all of this, the statement attributed to Booth is so contrary to human experience as to border on the ridiculous. The suggestion that any business concern, dealing with out-of-state strangers, would voluntarily deliver $5,000 cash to such out-of-state stranger without having ever seen the agreement pursuant to the terms of which the $5,000 was to have been paid would be rejected by anyone in their right mind as incredible. It is most significant that Latta conceded this to be a fact as the following questions and answers on Latta's cross-examination will demonstrate:

> In other words, he represented to you that a man in Atlanta sent him five thousand when several points in the option agreement had not even been cleared up?
>
> A. That is correct.
>
> Q. *Did you believe that?*
>
> A. *Not necessarily.* (Emphasis added.)

Tr. 61.

Booth emphatically denies the statement attributed to him. This, however, plays no part in the court's decision since, were there any evidence of probative value in conflict with his denial, the rejection of Booth's testimony by the Commission would be binding upon this appeal.

## Conclusion

While the court cannot substitute its judgment for that of the Commission and can only reverse the action of the Commission where it is unsupported by credible evidence and where such action is arbitrary, capricious, or an abuse of discretion, the record in this case, viewed as a whole, gives the court no pause.

The evidence upon which the Commission reached its conclusions in this case is considered to be without probative value.

To deprive a man, whose record of over thirty years in his chosen profession has been unsullied, of his livelihood upon such evidence as appears in this record would be the gravest miscarriage of justice. In so doing, the Commission's actions were both arbitrary and capricious.

For these reasons, the action of the Commission in revoking the license of the respondent Booth will be reversed. For reasons heretofore given, the Commission's action in revoking the license of John F. Batte, Jr., and J. F. Batte & Sons of Richmond, Inc., will also be reversed.